IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 14-cv-02606-RPM

KIM LUCERO,

    Plaintiff,

v.

EVELYN DODD,
RAUL MIERA, and
SHARIAN HAINDEL,

    Defendants.

---

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Kim Lucero ("Lucero" or "Plaintiff") was an involuntarily committed patient at the Colorado Mental Health Institute at Pueblo ("CMHIP") on November 28, 2012, when she was brutally stabbed by a fellow patient. Plaintiff seeks damages against defendants Evelyn Dodd, Raul Miera, and Sharian Haindel (collectively "the defendants"). They were working as nurses at the CMHIP when the attack occurred, and Plaintiff alleges they failed to protect her from the assailant. The complaint alleges two claims for relief: (1) damages under 42 U.S.C. § 1983 for deprivation of Plaintiff's right of substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution; and (2) negligence under the common law of

Colorado, asking for the exercise of supplemental jurisdiction under 28 U.S.C. § 1367. The defendants are sued in their individual capacities.[1]

After the close of discovery, the defendants moved pursuant to Fed. R. Civ. P. 56 for dismissal of Plaintiff's section 1983 claim, asserting that the doctrine of qualified immunity shields them from liability. They contend that Plaintiff's evidence is not sufficient to show a constitutional violation, and even if it is, the defendants cannot be held liable because the law was not clearly established.

The defendants do not dispute that the evidence is sufficient to create a triable issue on Plaintiff's negligence claim. They assert, however, that dismissal of Plaintiff's section 1983 claim would deprive this court of subject matter jurisdiction, requiring dismissal of the negligence claim without prejudice to refiling in state court.

Plaintiff opposed the motion. Briefing has been completed. The Court heard argument of counsel on January 17, 2018.

The following facts are undisputed, except where stated.

Plaintiff was involuntarily committed to the CMHIP in October 2010. During the relevant time period, Plaintiff resided on a ward at the CMHIP known as the Advanced Cognitive Behavioral Unit ("ACBU").

The ACBU is a locked unit, but is considered a minimum security "community reintegration unit." Patients residing in that unit receive therapy that focuses in part on preparing them to live independently in the community. *See* Def.'s Ex. F, ACBU Unit Rules, p. 1. Some

---

[1]The complaint also named as defendants Bill May (a former superintendent of the CMHIP) and John Does 1-4. Plaintiff's claims against the Doe defendants and May were dismissed by orders dated April 25, 2016 [doc. 91] and June 7, 2017 [doc. 96].

ACBU patients enjoy privileges that allow them to leave the unit or leave hospital grounds and spend time in the community without an escort.

When Plaintiff lived on the ACBU ward, Lamar Delray Davis ("Davis") was also an inpatient there. Davis had been involuntarily committed to the CMHIP in December 2004, after being found Not Guilty by Reason of Insanity in connection with a charge of second degree assault.

Davis's criminal history records state that he stabbed his stepfather in the chest with a knife during a family disturbance on November 4, 2001. Pl.'s Ex. 1 at 000155-56. Davis was criminally charged, and in May 2002 was given a deferred sentence on the charge of second degree assault and granted probation for the charge of third degree assault. *Id.* at 000104. In June and August, 2004, while Davis was on probation, he left a series of threatening messages on the voicemails of his probation officer and another probation officer. *Id.* at 000070-71. The messages included threats and statements such as: "you could lose your life and your job;" "don't make me come up there and slap you around," and "you need to be naked when I come to my next appointment." *Id.* Davis was charged in Adams County on August 20, 2004, with Harassment by Telephone Threat/Obscene. *Id.* On December 6, 2004, Davis was found not guilty by reason of insanity and ordered transferred to the CMHIP "Until Restored to Reason." *Id.* at 000015.

Nearly eight years later, Davis was still an involuntarily committed patient, living on the ACBU.

By the fall of 2012, Davis had been granted privileges allowing him to spend a certain number of hours off the CMHIP grounds to attend classes at Pueblo Community College and engage in activities such as shopping and dining at restaurants without supervision.

The CMHIP's care plan for Davis dated October 15, 2012 indicated Davis had reported that thoughts of forced or violent sexual contact would "accidentally pop into his head." Def.'s Ex. J-1. That care plan also stated that Davis was recertified for continued stay at CMHIP because he "continued to suffer from an abnormal mental condition that was likely to lead to dangerousness." *Id.*

On November 22, 2012, Davis was off the CMHIP grounds when he got into a physical fight at the home of a former CMHIP patient identified as "D.T."

Davis's treatment team met on November 26 and 27, 2012, and discussed Davis's off-campus conduct. Def.'s Ex. J, Case Consultation. Davis admitted getting into a "physical altercation" with D.T., D.T.'s daughter Devon, and friend Teresa. Davis told the treatment team that the others had assaulted him because Davis owed D.T. $30 for prostitution. *Id.*

Davis's treatment team decided that all of his privileges should be discontinued. *Id.*

Notes of those treatment team meetings, prepared by Senior Forensic Advisor Robin McCann, Ph.D., included the following statements: "staff did not report unstable behavior on Del Ray's part (other than the 11-22 allegation)," and "there was no evidence that [Davis] was a danger to himself or others on the unit." *Id.*

Before November 28, 2012, Davis had no history of violence on the grounds of the CMHIP.

In the early morning of November 28, 2012, Nurse Dodd was working at the ACBU. Her shift had started on November 27, 2012, at 10:45 p.m. and was scheduled to end at 6:45 a.m. Nurse Miera was working that same shift. Nurse Haindel was also there, working an 11:00 p.m. to 7:00 a.m. shift.

Nurses at CMHIP are expected to read the care plans for each of their patients. Nurse Dodd had access to Davis's chart and from time to time read the progress notes in the chart. She had known Davis for several years as a patient on the ACBU and knew him fairly well.

On the morning of November 28, 2012, Nurse Dodd knew that Davis's off-grounds privileges had been suspended recently. According to Nurse Dodd, when a patient's privileges are suspended, the nurses exercise a "heightened state of observation" because inpatients sometimes respond to the loss of privileges by becoming upset and angry and causing problems. Pl.'s Ex. 2, Dodd Dep.155:19 - 156:22.

At approximately 6:15 a.m., on November 28, 2012, all three defendants were at the nurses' station when Davis approached Nurse Dodd and asked to use scissors.

The CMHIP's nursing department has written policies regarding the monitoring of "sharps." Def.'s Ex. H, Sharps Monitoring, 9/28/12. Sharps were to be stored in a locked location and checked in and out by a staff member. Nursing staff were required to count sharps at every shift change.

In addition to the nursing department's policies, the ACBU Unit has written rules regarding patients' use and possession of "razors and sharps." Def.'s Ex. F, ACBU Unit Rules ¶30. The applicable version of those rules stated, "Razors and sharps are permitted in dorms

only for the time needed to accomplish shaving. . . . Patients may request razors as needed. The razor must be in your possession at all times and be returned to staff in a timely manner." *Id.*

Patients need a physician's order for the privilege to use certain tools, including knives and scissors. The ACBU Unit Rules stated that "no sharp knives are allowed in the kitchen, unless this patient has a physician's order for knife privileges." ACBU Unit Rules ¶ 60.

Davis had been granted certain privileges in 2008 which allowed him access to knives and scissors, and in 2010, he had been granted privileges for scissors and sewing needles. *See* Def.'s Ex. M.

ACBU patients with privileges to use scissors were permitted to take scissors to their rooms or another area of the unit. ACBU staff members were not required to watch a patient use scissors.

When Davis's off-campus privileges were suspended on November 26, 2012, the treatment team did not specifically address his on-campus privileges regarding access to scissors, knives or other sharps. *See* Def.'s Ex. J. Defendants contend that the suspension of Davis's privileges meant only that he was restricted to the ACBU ward and was prohibited from going off-campus. Defendants say that a physician's order would have been necessary to revoke Davis's privilege to use scissors. *See* Def.'s Ex. N, Ortiz Dep. 105:5 - 107:24. Plaintiff contends that when the treatment team suspended Davis's privileges, that implied that his access to scissors was also discontinued.

The parties' dispute about the scope of the suspension is of little consequence. The material undisputed fact is that on November 28, 2012, the ACBU nursing staff had authority to control Davis's access to scissors and could have denied or limited his access.

When Davis asked to check out the scissors, Nurse Dodd reminded Davis that he had just lost his off-ground privileges. Davis replied, "Yes I know. I want the scissors." Def.'s Ex. A, Dodd Dep. 63:10-14.

After Davis signed a book to check out the scissors, Nurse Dodd removed the scissors from a locked cabinet and gave them to him. The scissors were pointed, metal scissors, approximately 6 - 8 inches long.

Nurse Dodd did not ask Davis why he wanted the scissors. She thought he wanted to use them in the kitchen. Nurses Miera and Haindel understood that Davis wanted to use the scissors to cut a pair of pants.

Davis took the scissors, went to the kitchen, and shortly thereafter returned to the nurses' station. He then asked for permission to visit a male patient, identified as "M.S."

The rules of the ACBU require patients to ask a nurse's permission before visiting another patient. Even with such permission, a patient can only knock on the door and is not allowed to go into another patient's room. Because M.S.'s room was not in the same wing as Davis's room, Davis needed permission to walk down that hallway and knock on M.S.'s door.

When Davis asked for permission to visit M.S., Nurse Dodd asked Davis where the scissors were. Davis responded that he had left the scissors in the kitchen. Davis lied about the scissors being in the kitchen, when in fact he had them in his pocket.

Because leaving the scissors unattended in the kitchen was a violation of the Unit's rules, Nurse Dodd told Davis to go back to the kitchen and get the scissors. She told him to keep the scissors with him and bring them back by 6:30 a.m., so the day shift could count them.

Davis went to the kitchen and came back to the nurses' station. He again asked permission to visit M.S. Nurse Dodd then gave Davis permission to go down the hallway and knock on M.S.'s door. She did not require Davis to return the scissors before allowing him to visit M.S.

Davis went down the hallway toward M.S.'s room. Plaintiff's room was located on the same hallway as M.S.'s room, closer to the nurses' station. Plaintiff was the only female patient on the ACBU at that time.

As Davis walked down the hallway, Nurse Dodd left the ACBU and went downstairs to respond to a buzzing intercom. Nurse Miera and Nurse Haindel remained at the nurses' station. From there, they could not see down the hallway to Plaintiff's room or M.S.'s room.

Davis went down hallway, entered Plaintiff's room and stabbed her with the scissors repeatedly in the face, eyes and arm.

Hospital police were summoned, and Davis was taken into custody.

Qualified immunity protects governmental officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant moves for summary judgment on the basis of qualified immunity, the the plaintiff has the burden of showing: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 - 16, 172 L. Ed. 2d 565 (2009); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)).

"[T]he court has discretion to determine 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.' " *Martinez*, 563 F.3d at 1088 (citing *Pearson*, 129 S. Ct. at 818).

Lucero claims that her injuries from the attack by Davis were caused by the defendants' failure to keep her reasonably safe in violation of the Due Process Clause of the Fourteenth Amendment.

A State's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause. *See DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189 (1989) (holding that employees of the county's department of social services did not violate the plaintiff's right of substantive Due Process by failing to protect plaintiff from physical abuse inflicted by his father).

For Plaintiff's constitutional claim, she must demonstrate "either (1) the existence of a special custodial relationship between the plaintiff and the defendants; or (2) that the defendants recklessly created the danger that caused the constitutional violation." *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (citing *Graham v. Independent Sch. Dist. No. I-89*, 22 F.3d 991, 994-95 (10th Cir. 1994)).

The defendants do not dispute that Plaintiff's involuntary confinement at the CMHIP created a special custodial relationship. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the United States Supreme Court held that a mentally retarded person involuntarily committed to a state institution had a constitutionally protected liberty interest under the Due Process Clause of the Fourteenth Amendment to reasonably safe conditions of confinement. *See also DeShaney*, 489 U.S. at 199 ("In *Youngberg* ... we [held] that the substantive component of the Fourteenth

Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."); *Uhlrig*, 64 F.3d at 572 ( "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g. when the individual is a prisoner or involuntarily committed mental patient).")

In this Circuit, a Due Process claim based on the special relationship doctrine has the following four elements:

> First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. And finally, fourth, the defendant's actions must shock the conscience.

*Dahn v. Amedei*, 867 F.3d 1178, 1185-86 (10th Cir. 2017) (citations omitted.)

In *Youngberg*, the United States Supreme Court addressed the standard for assessing the professional judgment of a state actor whose decision allegedly violated the substantive Due Process rights of an involuntarily committed mental patient. The Court stated:

> . . . the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

457 U.S. at 323.

As evidentiary support for her constitutional claim, Plaintiff submitted a report of the opinion of Karin Taylor, a registered nurse with more than 30 years of experience in psychiatric nursing. Pl.'s Ex. 12. Taylor opines that Nurse Dodd abdicated her professional judgment by:

>    (a) allowing Mr. Davis to check out the long pointed scissors while his privileges were suspended, without questioning him about the specific reason he wanted to use scissors in the kitchen at 6:15 a.m., and without any supervision of his use of scissors that morning; (b) failing to ascertain why Mr. Davis needed the scissors to go to the patient hallway; (c) failing to request the return of the scissors before giving Mr. Davis permission to go down the patient hallway; (d) allowing Mr. Davis to take the scissors with him when he went down the patient hallway; and (e) allowing Mr. Davis to go, unsupervised, down the patient hallway with the scissors.

Taylor report p. 4. Taylor also opines that Nurses Miera and Haindel abdicated their professional judgment "by not supervising Davis's use of the scissors that morning and allowing him to take the scissors with him on an unsupervised visit to another inpatient, while Nurse Dodd left the area to get the newspaper." *Id.* Taylor says that any one of the three nurses could have refused to give Davis scissors; refused him access to the hallway where Plaintiff resided; watched him as he

went down the hallway, or asked Davis to return the scissors before allowing him to go down the hallway. *Id.* p. 5.

Defendants argue that Plaintiff's evidence shows only a failure to assess the risk that Davis might use the scissors to commit an assault. They say that failure may be negligent but does not rise to the level of conscience shocking conduct required for a violation of the Fourteenth Amendment.

It is hard to understand why Nurse Dodd accepted without question Davis's need to use scissors at 6:15 a.m. for use in the kitchen. It is even harder to understand why she did not take the scissors away from him before granting his request to visit M.S. There is not only a complete lack of professional judgment in this conduct, it shows a lack of common sense. This indifference to an apparent risk is a shock to the conscience of this court.

The question then is whether there was at that time any clearly established law of which these nurses should have been aware to know that they were in violation of the Constitution.

"[T]his inquiry must be made 'in light of the specific context of the case, not as a broad general proposition.' " *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam )). A case directly on point is not required, but existing precedent must have placed the statutory or constitutional question beyond debate. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017).

Citing *Youngberg*, Plaintiff says it has long been established that a person involuntarily committed to a state mental institution has a protected liberty interest in services necessary to ensure their reasonable safety from others. Plaintiff also cites *DeShaney* for its discussion of *Youngberg* and the "special relationship" exception.

Plaintiff's citation of that case authority is not sufficient to overcome the protection of qualified immunity in this case. In *White v. Pauly*, the United States Supreme Court recently reiterated the rule that "clearly established law must be particularized to the facts of the case." 137 S.Ct. at 551-52.

Plaintiff also cites *Estate of Conners v. O'Connor*, 846 F.2d 1205 (9th Cir. 1988), arguing that the facts of that case are strikingly similar to the facts presented in this action.

*Conners* was a section 1983 case brought by the estate of an involuntarily committed mental patient (Marilyn Marie Conners), who was raped and murdered by a fellow patient (John Duncan) in a remote corner of the hospital grounds. Duncan was a "penal code" patient who had been confined after pleading not guilty by reason of insanity to a charge of rape and murder of another young woman. The plaintiffs alleged that the hospital administrators were grossly

-12-

negligent and recklessly indifferent to patient safety when they approved ground privileges for penal code patients. The defendants moved for summary judgment, arguing that the doctrine of qualified immunity shielded them from liability. In response to the motion, the plaintiffs presented an affidavit of a psychiatrist who described the hospital's approach to assessment and determination of risk from violence, as "grossly and totally inadequate" in that it failed to give special consideration to penal code patients. *Id*. at 1208-1209. The expert also noted that the staff made no attempt to rectify the problems, despite a history of violence among penal code patients at the hospital. *Id*. The defendants presented competing affidavits. The trial court concluded that issues of material fact precluded summary judgment. *Id.* at 1206. The United States Court of Appeals for the Ninth Circuit affirmed the denial of summary judgment, finding that "the facts alleged in the [plaintiffs' expert's] affidavit, if proven, could reasonably support a trier's finding that the defendants were indifferent to patient safety and had made 'such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that [they] actually did not base the decision on such a judgment.'" *Id.* at 1209 (quoting *Youngberg*, 457 U.S. at 323). The Circuit Court considered *Youngberg* to be the clearly established law. *Id.* at 1208.

The facts of *Conners* are far more extreme and distinguishable from the facts of this case. Duncan (the assailant in *Conners*) was committed following his rape and murder of another young woman and the subject attack occurred only two or three weeks after Duncan had committed an assault with a deadly weapon and attempted rape on another female patient. *See Conners*, 846 F.2d at 1207 n.2. The evidentiary record in *Conners* included a history of violence by penal code patients. In contrast, there is no evidence of any prior acts of violence during the

years that Davis was in the CMHIP.  The reported physical altercation off campus earlier in November was not sufficiently comparable to this assault to serve as a warning that Ms. Lucero would be stabbed.

In sum, Plaintiff has not provided any legal authority sufficiently similar to the facts of this case to make a reasonable person in the position of the defendant nurses aware that their failure to control Davis's use of scissors was a violation of the Fourteenth Amendment.

With dismissal of the federal claim on summary judgment, the Court declines to exercise supplemental jurisdiction of the claim under Colorado common law.

Upon the foregoing, it is

ORDERED that Defendants' motion for summary judgment [doc. 90] is granted.

The clerk shall enter judgment dismissing Plaintiff's claim under 42 U.S.C. § 1983 with prejudice; dismissing Plaintiff's state law claim of negligence without prejudice; and dismissing this civil action, with costs to be taxed.

Dated:  January 29, 2018

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior Judge